# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| U.S. EQUAL EMPLOYMENT | ) | |
| OPPORTUNITY COMMISSION | ) | |
| | ) | |
| Plaintiff, | ) | No. 02 C 4672 |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| CIRCUIT CITY STORES, INC. | ) | Magistrate Judge Ashman |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

The Equal Employment Opportunity Commission ("EEOC") has brought this suit against Circuit City Stores, Inc. ("Circuit City") under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq*., the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 621 *et seq.*, and Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981a. The EEOC alleges that Circuit City discriminated against Sahag Yapejian ("Yapejian") by retaliating against him for filing a charge of discrimination with the Illinois Department of Human Rights ("IDHR"). Circuit City has moved for summary judgment and to strike the EEOC's claim for punitive and other damages. For the reasons that follow, the motion for summary judgment is denied. The request to strike the EEOC's prayer for punitive and other damages is granted in part and denied in part.

# BACKGROUND[1]

## A.    Events Prior to Yapejian's Filing of the IDHR Charge

In May 1993, Circuit City opened a store in Naperville, Illinois. John Boyk ("Boyk") hired Yapejian as the store's custodian. At the time, Yapejian was 47 years old. His employment application accurately indicated that he had been educated in Armenia.[2] Yapejian's starting pay rate was $7.00 per hour.

In 1995, Yapejian began to complain that he was underpaid and was being treated unfairly. He felt that the quality of his work was excellent and that he was not being compensated accordingly. Yapejian retained an attorney who wrote a letter to Circuit City on August 11, 1995, claiming that Circuit City had delayed conducting Yapejian's wage and performance reviews and that Yapejian was entitled to corresponding wage adjustments. The letter also accused Circuit City of using the delays to discourage Yapejian from asserting his rights under the Worker's Compensation Act. Circuit City replied with a letter explaining the rate of Yapejian's pay and claiming that Yapejian had received greater pay increases at earlier dates than his peers.

In 1996, Yapejian underwent a scheduled performance review and received a pay increase of $1.00 per hour. Yapejian stated that he was happy with the raise. In 1997, however, Yapejian received a raise of 30 cents per hour. He complained, arguing that the increase was incommensurate with the quality of his work. In addition to raising the issue with Mike Oliveri ("Oliveri"), the Naperville store's operations manager at the time, Yapejian also wrote to Danny Clark ("Clark"), a Circuit City Division Manager. The complaint was referred to Circuit City's regional human

---

[1] The narrative that follows is adapted from the parties' Local Rule 56.1 Statements.

[2] In at least some of the documents, Yapejian states that his national origin is Iraqi.

resources staff, who met with Yapejian to discuss his concerns.[3]

In 1998, Rakesh Bali ("Bali") and Jody Rankin ("Rankin") were the Naperville store's managers. Bali and Rankin conducted Yapejian's performance review and informed Yapejian that he would receive a raise of 25 cents per hour. Yapejian complained, again insisting that based on the quality of his work, he was entitled to a better wage. As a result, Bali and Rankin raised Yapejian's wages by an additional 25 cents per hour. Yapejian now made $10.75 per hour.

In 1998 and early 1999, Yapejian continued to express dissatisfaction about his pay. He also began to complain that Bali, Rankin, and Boyk, who now was a Circuit City District Manager, were not treating him with respect. In May 1999, Yapejian wrote a letter stating these concerns to Circuit City Regional Manager, Donald Walter ("Walter"). Yapejian also claimed that Arnie White ("White"), a custodian at Circuit City's Downers Grove location, earned a greater hourly wage than he.

Walter wrote back stating, among other things, that he would direct Kathy Lafakis ("Lafakis"), a member of Circuit City's human resources department, to meet with Yapejian. The meeting appears to have done little good: in a subsequent letter to Walter, Yapejian stated that he didn't see "eye-to-eye" with Lafakis, and that, despite the fact that he was better qualified than White, Yapejian was not being paid accordingly.

Despite his frequent complaints, the quality of Yapejian's work consistently was rated very high by his superiors. Indeed, in some years, Yapejian scored 100 out of 100 on his performance

---

[3] The parties provide no further information about the substance or outcome of the meeting.

evaluations.  On his review for the year 1999[4] – the year in which he filed his IDHR discrimination

charge – Yapejian earned a 93 out of 100.  Comments accompanying the 1999 evaluation stated that

Yapejian's "job knowledge exceeds expectations of a janitor," that he "has done other jobs that have

required skills other than normal duties," and that he "will adapt to increased hours."  It is

undisputed that before filing his charge, Yapejian had never been subject to any disciplinary action.

**B.      Events Subsequent to Yapejian's Filing of the IDHR Charge**

On July 28, 1999, Yapejian filed a charge of discrimination with the IDHR, claiming that

he was paid less than Arnie White (who, Yapejian claimed, made $15 per hour) and that the

differential treatment was based on Yapejian's age and national origin.  The IDHR dismissed

Yapejian's charge for lack of substantial evidence (though the EEOC claims that Circuit City

refused to cooperate in the investigation) and the EEOC affirmed the dismissal.  It is undisputed that

after Yapejian filed the IDHR complaint, Bali remarked to Yapejian: "That is not a good idea."  The

parties disagree, however, about the length of time between the charge's filing and Bali's statement.

In any event, Circuit City claims that "sometime in late 1999," Boyk reviewed the Naperville

store's profit-and-loss statements and identified a number of ways in which expenses could be cut.

Specifically, Boyk determined that employees should no longer be paid extra money for performing

---

[4] There appears to be some uncertainty about the year in question.  The EEOC states that the year of the evaluation was 1999; Circuit City identifies the year as 1998.  *See* Def.'s Resp. to EEOC's Stmt. Add'l Material Facts ¶ 24.  The court assumes that the evaluation took place in 1999 but that the year under evaluation was 1998.  In any case, the exact year in question is of less importance than the fact that the evaluation took place at least as late as 1998, since Circuit City argues that Yapejian's reviews in earlier years, having been conducted by managers other than Bali and Rankin, are immaterial.

tasks after regular working hours that fell within employees' normal job descriptions. Circuit City claims that Boyk also determined that stores, including the Naperville store, were to exercise "better control" over the use of petty cash funds.

Prior to this decision, Yapejian had been paid for performing certain jobs after hours. Chief among these was the stripping and waxing of what the parties call the "red race track," a 150-foot pathway of red flooring material that runs around the store's sales floor. Although the parties agree that cleaning, stripping, and waxing the red racetrack were among Yapejian's responsibilities, Yapejian claims that because the job took several hours to complete, he shared the task with a crew of three to five warehouse workers and other employees, that the job was performed after the store had closed, and that the crew was paid from petty cash funds. Circuit City now required Yapejian to complete the task himself, and to do so during normal working hours, without any additional compensation.

Thereafter, Yapejian was subjected to various forms of disciplinary action. In September 1999, Yapejian received a "coaching" as a result of an incident in which Yapejian allegedly requested additional compensation for cleaning the area around the store's trash compactor. Yapejian claims that he was merely joking about asking for additional payment. In January 2000, Yapejian received another coaching when he took an unscheduled day off of work to attend his sister's funeral. The EEOC claims that Yapejian gave Bali notice that he would be absent. On the same day, Yapejian received a "write-up" based on Circuit City's belief that, in contravention of a direct order, Yapejian had faxed a flier to other Circuit City stores offering equipment repair services. Circuit City concedes that it was mistaken on this point and that Yapejian had not in fact sent the fliers. Yapejian claims that Circuit City was aware all along that he had not done so.

Matters came to a head in April and May of 2000. Circuit City claims that Yapejian repeatedly failed to complete cleaning assignments during these months and that he was warned about insubordination. Circuit City further claims that, in addition to failing to strip and wax the red race track, Yapejian failed to clean floors in the bathroom and customer pickup areas. When Yapejian claimed that he was unable to strip and wax the entire track by himself, Circuit City claims that it instructed him to complete the task in parts. When Yapejian still failed to complete the task, Caroline Bertucci ("Bertucci"),[5] Circuit City's Human Resources Manager, drafted a memo recommending Yapejian's termination. Yapejian was discharged on May 15, 2000.

Shortly after his termination, Yapejian filed another charge with the IDHR, claiming that his firing was retaliatory in nature. However, Yapejian grew dissatisfied with the IDHR's handling of his earlier complaint. He later withdrew the charge and asked the EEOC to handle the investigation of the retaliation claim. The EEOC subsequently filed this suit.

## DISCUSSION

### I. LEGAL STANDARD

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In the consideration of a motion for summary judgment, the court must view the record and any inferences to be drawn from it in the light most favorable to the party opposing summary judgment. *See Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir. 1991). The party opposing summary judgment may not rest upon the pleadings, but "must set forth specific facts showing that

---

[5] Bertucci also is identified in a number of documents as Caroline Noonan.

6

there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A more particular set of standards applies to retaliation claims at the summary judgment stage. Plaintiffs in employment discrimination or retaliation cases can survive summary judgment in two ways: by means of either the direct or the indirect methods. *Marinich v. Peoples Gas Light and Coke Co.*, 45 Fed. Appx. 539, 543 (7th Cir. 2002). Under the direct method, the plaintiff must establish a *prima facie* case by presenting direct evidence that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two. *Luckie v. Ameritech Corp.* 389 F.3d 708, 714 (7th Cir. 2004). If the evidence is uncontradicted, the plaintiff is entitled to summary judgment. *Id.* If the evidence is contradicted, the case must be tried unless the defendant presents "unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had had no retaliatory motive; in that event the defendant is entitled to summary judgment because he has shown that the plaintiff wasn't harmed by retaliation." *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

Under the indirect or "burden-shifting" method, the plaintiff must establish that: (1) he engaged in statutorily protected activity; (2) he was performing his job according to his employer's legitimate expectations; (3) despite his satisfactory performance, he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Luckie*, 389 F.3d at 714. If the plaintiff succeeds in proving his *prima facie* case, the employer must offer a legitimate, noninvidious reason for the adverse employment action. *Hilt-Dyson v. City Of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). Once the employer has done so, the burden of production shifts back to the plaintiff to demonstrate that the

employer's proffered reason is pretextual in nature.  *Id*.[6]

The EEOC has opposed Circuit City's motion for summary judgment by means of both the direct and indirect methods.  The court discusses the parties' arguments with respect to each method in turn.

## III.    Direct Method

### A.    Protected Expression

The first step in making out a *prima facie* case of retaliatory discharge (under both the direct and indirect methods) is to establish that the expression for which the plaintiff was allegedly punished is statutorily protected.  In order for the plaintiff's expression to be protected, the challenged practice need not actually violate Title VII.  *Holland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1314 (7th Cir. 1989).  Rather, an employee need only have a reasonable belief that he is challenging conduct violative of Title VII.  *See, e.g.*, *Hamner v. St. Vincent Hosp. and Health Care Center, Inc.*, 224 F.3d 701, 706-07 (7th Cir. 2000).  Thus, even if Circuit City had not in fact discriminated against Yapejian, his decision to file a charge with the IDHR constitutes protected

---

[6] Although the EEOC brings its claims under both Title VII and the ADEA, the applicable legal standards are the same.  *See, e.g.*, *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 885 n.1 (7th Cir. 1996) ("The anti-retaliation provision of the ADEA has been recognized as "parallel to the anti-retaliation provision of Title VII ... and cases interpreting the latter provision are frequently relied upon in interpreting the former.") (quoting *Passer v. American Chem. Soc'y*, 935 F.2d 322, 330 (D.C. Cir. 1991)); *Wentz v. Maryland Cas. Co.*, 869 F.2d 1153, 1154 (8th Cir. 1989) ("Proving retaliation claims under the ADEA follows the same general approach taken to similar claims brought under Title VII of the Civil Rights Act of 1964."); *see also Cecilio v. Allstate Ins. Co.*, 908 F. Supp. 519, 531 (N.D. Ill. 1995) (noting that "retaliation claims under Title VII and ADEA follow the same ping-pong approach as do discrimination claims"); *Balderston v. Fairbanks Morse Engine*, No. 02-C-210-C, 2003 WL 342124, at *3 (W.D. Wis. Jan. 27, 2003) ("The case law interpreting the retaliation provision under Title VII applies to the retaliation provision under the ADEA; the retaliation provisions under both statutes are nearly identical.").

expression so long he reasonably believed that Circuit City had discriminated against him.

Circuit City advances a number of arguments in an attempt to show that Yapejian's charge of discrimination with the IDHR was not reasonable and thus cannot form the basis for a retaliation claim. First, Circuit City notes that Yapejian was 47 years old when he was hired, which already placed him in the class protected by the ADEA (individuals over forty years of age). Circuit City claims that this "counters" any inference that age played a role in determining Yapejian's subsequent raises. This is a *non sequitur*: the fact that Yapejian suffered no discrimination when he was hired is perfectly consistent with the possibility that he was subject to discrimination later in the course of his employment (and as he became older).

Similarly, Circuit City argues that Yapejian could not have been subject to discrimination on the basis of his national origin since Circuit City was aware of Yapejian's national origin at the time he was hired. Again, this argument fails as a matter of logic: the fact that Circuit City did not discriminate against Yapejian when it hired him does not exclude the possibility that he suffered discrimination on the basis of his national origin at later points during his employment. Yapejian was hired in 1993. The alleged discriminatory activity began in 1995 and continued until his termination in 2000. A reasonable jury could find that the discriminatory animus developed or surfaced only after Yapejian was hired–as a result, for instance, of changes in the Naperville store's management.

Next, Circuit City argues that Yapejian's IDHR complaint was baseless because in his prior complaints to Circuit City, he never claimed that his age or national origin had anything to do with his unfair treatment. The authorities upon which Circuit City bases this contention, *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997 (7th Cir. 2000), and *Gleason v. Mesirow Financial,*

*Inc.*, 118 F.3d 1134, (7th Cir. 1997), are inapposite. The relevant portions of these cases address the viability of the *retaliation* claims, not the validity of the plaintiffs' underlying discrimination claims. Moreover, the retaliation claims in *Miller* and *Gleason* failed because the plaintiffs in those cases complained of discrimination only *after* they had been terminated by their employers. Since the complaints were unknown to the employers, the courts in both cases found that the complaints could not have formed the basis for the employers' decisions to discharge the plaintiffs. *See Miller*, 203 F.3d at 1008 ("An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints."); *Gleason*, 118 F.3d at 1146-47 ("Gleason fails to establish the first element of a *prima facie* case of retaliation (engaging in "protected expression") because she never reported her allegations of sexual harassment *during her term of employment with the defendant-appellee*.") (emphasis in original). No such logical impossibility exists here: in light of the fact that Yapejian filed his charge with the IDHR roughly ten months prior to his termination, a jury might well find that Circuit City fired him because of those complaints.[7] In any event, the court concludes

---

[7] Circuit City also cites *Little v. United Technologies, Carrier Transicold Div.*, 103 F.3d 956 (11th Cir. 1997) in support of its argument that Yapejian's charge of discrimination was baseless. The plaintiff in *Little* was a white male who claimed that one of his coworkers had made a racist remark about African-Americans. Little informed the corporation's management of the remark some eight months later. Little subsequently was fired and claimed that he had been discharged in retaliation for his opposition to racial discrimination within the corporation. In upholding the district court's grant of summary judgment for the defendant, the court stated that "on the particularized facts of this case, Little did not have an objectively reasonable belief that he was opposing an unlawful employment practice." *Id.* at 960. The facts of *Little* are easily distinguishable from those in the instant case. Yapejian's decision to file a discrimination charge with the IDHR, for example, might be regarded as a much more serious step (and one more likely to trigger retaliation) than Little's decision simply to inform the management of his corporation of a coworker's racist comment. Similarly, Yapejian's IDHR charge and his subsequent termination must be understood against the backdrop of numerous other complaints and incidents, which took place over the course of roughly five years, between Yapejian and

that a reasonable jury could find that Yapejian believed that Circuit City's failure to award him higher pay raises was due to his age or national origin, even if he did not articulate his belief in such specific terms to his superiors.

Finally, in its reply brief, Circuit City makes the additional contention that Yapejian's age discrimination claim fails as a matter of law because the age difference between Yapejian and Arnie White, the Downers Grove custodian to whom Yapejian compared himself in his IDHR complaint, was only eight years. Circuit City claims that under *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997), age disparities of fewer than ten years are "presumptively insubstantial" for purposes of the ADEA. Since this argument was raised only in Circuit City's reply brief, it is deemed waived. *See, e.g.*, *Griffin v. City of Chicago*, 406 F. Supp. 2d 938, 942 (N.D. Ill. 2005) ("Defendant raises this argument for the first time in his reply brief in support of his motion for summary judgment, and thus does not allow plaintiff an opportunity for rebuttal. It is well settled that '[r]aising an issue for the first time in reply is improper, as it deprives the opposing party of a meaningful chance to respond.'") (citing *Peterson v. Knight Architects, Engineers, Planners, Inc.*, No. 97 C 1439, 1999 WL 1313696, at *13 (N.D. Ill. Nov. 4, 1999)). The court thus declines to grant summary judgment on the basis of this contention.[8]

---

Circuit City's management. While not all of those incidents involved explicit charges of discrimination, when taken as a whole, they afford grounds for a much wider range of inferences than those that might be drawn from the single event at issue in *Little*.

[8] In any event, the argument fails. *Hartley* did not hold that an age difference of fewer than ten years completely forecloses an age discrimination claim. The court held merely that in age discrimination cases, an age difference of ten years is *presumptively* substantial (and correlatively, that an age difference of fewer than ten years is *presumptively* insubstantial). The viability of Yapejian's underlying charge of age discrimination would depend on whether he was able to produce sufficient evidence to overcome these presumptions. However, it is not necessary for Yapejian actually to have produced such evidence with respect to his underlying

## B.     Direct Evidence of Discrimination

The court next considers whether the EEOC has provided direct evidence of Circuit City's intent to retaliate against Yapejian. "Direct evidence" is evidence that shows an employer's intent without recourse to inference or presumption.[9] *See, e.g.*, *Velez v. City of Chicago*, 442 F.3d 1043, 1049 (7th Cir. 2006). Essentially, direct evidence is an outright admission by the decisionmaker that the challenged action was undertaken for retaliatory reasons. *See, e.g.*, *Hicks v. Sheahan*, No. 03 C 0327, 2004 WL 3119016, at *21 (N.D. Ill. Dec. 20, 2004). Such evidence is very rare. *Id.* (direct evidence such as the "I-am-not-promoting-you-because-you-are-a-woman type is understandably rare") (quoting *Volovsek v. Wisc. Dep't of Agric., Trade, and Consumer Prot.*, 344 F.3d 680, 689 (7th Cir. 2003)). If the direct evidence offered by the plaintiff is contradicted, the case must be tried unless the defendant presents unrebutted evidence that it would have taken the adverse employment action anyway, "in which event the defendant's retaliatory motive, even if unchallenged, was not a but-for cause of the plaintiff's harm." *Id.* (quoting *Stone v. City of Indianapolis Public Utilities*

---

discrimination charge, for Yapejian need not be able actually to prevail on that charge. In order to make out his retaliation claim, as noted above, Yapejian need only show that his underlying charge was not objectively or subjectively unreasonable. The mere presumption that age differences of fewer than ten years are insubstantial does entail that his underlying discrimination charge was unreasonable.

[9] The court notes that there is some confusion as to whether circumstantial evidence may be used as a form of direct evidence. *Compare Koszola v. Board of Educ. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004) ("A plaintiff can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker. That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action.") (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)), *with Hudson v. Chicago Transit Authority*, 375 F.3d 552, 560 (7th Cir. 2004) ("We held in *Stone* that inferences and circumstantial evidence cannot be used to establish a prima facie case for retaliation under the direct evidence test.").

*Division*, 281 F.3d 642 (7th Cir. 2002)).

The EEOC points to two forms of direct evidence that Yapejian was terminated in retaliation for filing his IDHR charge. First, it is undisputed that at some point after Yapejian filed the charge, Bali remarked to him that it "was not a good idea." Absent further assumptions and inferences, this isolated remark does not show Circuit City's intent to retaliate against Yapejian. On the contrary, Bali's statement might be interpreted in a variety of ways. As Circuit City argues, for example, the remark might just as well be viewed as an expression of exasperation on Bali's part. Hence, the court concludes that Bali's remark does not constitute direct evidence.

Second, the EEOC points to a memorandum drafted by Caroline Bertucci, a member of Circuit City's Human Resources Department, requesting Yapejian's termination. While this contention is slightly more persuasive, it, too, ultimately fails. The memorandum states that the "primary issue impacting Mr. Yapejian's performance is his failure to perform requested and required custodial duties," and refers more specifically to "Mr. Yapejian's failure to clean and wax the red race track." The fact that Yapejian had filed an IDHR claim is listed at the end of the report, along with seven other items–including Yapejian's complaints about his pay-raises and the fact that Yapejian sustained a lower back injury in 1997–under the heading of "Other Pertinent History." The document's reference to the IDHR charge is incidental at best and is a far cry from an outright admission that Circuit City fired Yapejian in retaliation for the charge.

Moreover, even if the memorandum could be regarded as providing direct evidence of Circuit City's intent to retaliate against Yapejian, the document does not establish that the IDHR charge was a *but-for cause* of Yapejian's termination. As Circuit City convincingly argues, viewing the IDHR as a but-for cause of its action would require viewing all of the items under the "Other

Pertinent History" as but-for causes. Among other things, that would entail the untenable conclusion that Yapejian's knee injury was a but-for cause of Yapejian's termination. The court therefore concludes that the EEOC has failed to make out a *prima facie* case of retaliation by means of the direct method.

## III.     The Indirect Method

### A.     The EEOC's *Prima Facie* Case

As noted above, under the indirect method, the plaintiff must establish that: (1) he engaged in statutorily protected activity; (2) he was performing his job according to his employer's legitimate expectations; (3) despite his satisfactory performance, he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Luckie*, 389 F.3d at 714. If the plaintiff fails to satisfy any element of the *prima facie* case, the retaliation claim fails. *Hilt-Dyson*, 282 F.3d at 465. If the plaintiff succeeds in proving his *prima facie* case, however, the employer must offer a legitimate, noninvidious reason for the adverse employment action. *Id*. Once the employer has done so, the burden of production shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual in nature. *Id*.

The court already has concluded in section III.A, *supra*, that the conduct Yapejian's filing of the IDHR charge was statutorily protected. It is similarly clear that, having been fired, Yapejian suffered an "adverse employment action" for the purposes of Title VII and the ADEA. The court therefore considers the remaining elements of the EEOC's *prima facie* case: whether Yapejian performed his job responsibilities in accordance with Circuit City's legitimate expectations, and whether Yapejian was treated less favorably than similarly situated employees.

14

### 1. Performance of job responsibilities according to legitimate expectations

The EEOC claims that, despite Circuit City's allegations of insubordination, Yapejian was performing his job responsibilities in accordance with Circuit City's legitimate expectations. Although Circuit City claims that Yapejian failed to perform assigned tasks – in particular, the stripping and waxing of the red racetrack – the EEOC has adduced evidence questioning whether Circuit City's expectations were legitimate. As an initial matter, the EEOC's evidence raises questions as to whether the task was truly necessary during the time period in question. It is undisputed, for example, that the red racetrack typically is cleaned every four to six months. *See* Def.'s Resp. to EEOC's Stmt. Add'l Facts ¶ 8. However, the EEOC points to evidence suggesting that Circuit City had paid a separate crew to clean the area only days before asking Yapejian to do so. *Id.* ¶ 54. In addition, the EEOC argues that Circuit City's managers themselves believed that it was impossible for the job to be performed by a single individual and that it could not be done while the store was open. *Id.* ¶ 67. The EEOC also has produced evidence calling into question whether Yapejian in fact was asked to complete the task in smaller increments. *Id.* ¶ 73.[10] Finally, the EEOC argues that even working on smaller increments, it would have been impossible for Yapejian to finish stripping and waxing the red racetrack by the date on which he was disciplined

---

[10] Circuit City claims that Yapejian testified during his deposition that Bali asked him to complete the stripping and waxing of the red racetrack in sections. In fact, however, Yapejian's testimony appears much more equivocal on this point. The relevant portion of the deposition transcript is as follows:

Q.  Did O'Donnell talk to you about doing [the red racetrack] in smaller pieces saying you don't have to do the whole thing at once?
A.  No.
Q.  Did Mr. O'Donnell say that to you?
A.  No. I think that Rakesh talked to me about that. I believe Rakesh. I never.

*See* Def.'s Ex. 37, Yapejian Dep. 186:23-187:5.

for failing to complete the task.  Pl.'s Resp. to Mot. for Summ. Judgment, at 12-13.

In short, the EEOC contends that Yapejian– whose job performance had always been highly regarded and who had never been subject to disciplinary action – had been set up for failure by being required to perform a task that he simply could not complete on his own.  To be sure, Circuit City has produced evidence showing that its reasons for requiring Yapejian to perform the task by himself were purely economic.  It also has produced evidence showing that the job of stripping and waxing the red racetrack could be completed by a single custodian during regular working hours.  Specifically, Circuit City has furnished evidence (hotly contested by the EEOC) that Arnie White was able to strip and wax the red racetrack at the Downers Grove store during regulars hours without assistance.  Nevertheless, viewing the facts and making all reasonable inferences in the EEOC's favor, the court concludes that the EEOC has produced enough evidence to show that Yapejian was performing his responsibilities in accordance with Circuit City's legitimate expectations.

### 2. Less favorable treatment than similarly situated employees

In evaluating whether two employees are similarly situated, the court must look at all relevant factors, including whether the employees: (1) held the same job description; (2) were subject to the same standards; (3) were subordinate to the same supervisor; and (4) had comparable experience, education, and other qualifications-provided the employer considered these latter factors in making the personnel decision.  *Bio v. Federal Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) (citing *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003)).  A plaintiff need not be completely comparable but rather must be substantially similar to the more favorably treated employees.  *Czerska v. United Airlines, Inc.*, 292 F. Supp. 2d 1102, 1112 (N.D. Ill. 2003).  Whether two employees are similarly situated ordinarily is a question of fact for the jury.  *See, e.g.*, *George*

*v. Leavitt*, 407 F.3d 405, 414-15 (D.C. Cir. 2005); *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d

Cir. 2000); *Terry v. Bank One, Indiana, N.A.*, No. 1:02-CV-1769-TAB-DFH, 2004 WL 1103011,

at *5 (S.D. Ind. May 17, 2004).

Identifying a similarly situated comparator is complicated in this case by the fact that

Yapejian was the only custodian employed by the Naperville store. The EEOC urges that since

Yapejian cannot be compared with other custodians at the Naperville store, he should be compared

with the store's warehouse workers. In support of its contention, the EEOC notes that the warehouse

workers reported to the same supervisors as did Yapejian. Def.'s Resp. EEOC's Add'l. Stmt. Facts,

¶ 6. The EEOC further points to the existence of a certain amount of overlap between the Yapejian's

and the warehouse workers' duties. It is undisputed, for example, that warehouse workers often

assisted Yapejian in the stripping and waxing of the red race track, and that they performed at least

some of his other responsibilities when he was absent from work. *Id*. ¶¶ 6, 7. For its part, Circuit

City argues that aside from cleaning the red racetrack, the warehouse workers' job responsibilities

were very different from Yapejian's. Circuit City argues that Yapejian should be compared with

Arnie White, the Downers Grove store's custodian.[11]

Based on the parties' contentions, the court finds a question of material fact concerning

whether Yapejian with similarly situated with respect to the warehouse employees. *See, e.g.*,

*Dawson v. Monaco Coach Corp.*, No. 3:02-CV-830 PS, 2005 WL 3005347, at *9 (N.D. Ind. Nov.

9, 2005) (denying motion for summary judgment because question of material fact existed over

---

[11] In a supplemental filing, the EEOC asks the court not to consider White's testimony for the purposes of this motion, due to alleged discrepancies between statements in White's affidavits and statements in his deposition testimony. Since the court concludes that summary judgment would be inappropriate regardless of whether White's statements are taken into consideration, the court need not specifically address the merits of the EEOC's request.

whether employees were similarly situated); *Gallo v. Advocate Health Care*, No. 01 C 0742, 2002 WL 1160957, at *4 (N.D. Ill. May 23, 2002) (same); *Stroup v. Clark*, No. 99 C 50029, 2001 WL 114404, at *6 (N.D. Ill. Feb. 2, 2001) (same). Once again, since all inferences must be drawn in the plaintiff's favor on a motion for summary judgment, the court concludes that the EEOC has presented sufficient evidence that Yapejian and the warehouse workers were similarly situated.

The next question is whether Yapejian was treated less favorably than the warehouse employees. The EEOC points to several ways in which Yapejian was subject to less favorable treatment than the warehouse workers. For example, the EEOC has produced evidence showing that while Circuit City required Yapejian to strip and wax the red race track by himself, subjected him to disciplinary action for failing to do so, and forbade him from earning extra money for the job, Circuit City paid groups of warehouse workers during the same time period to complete the task as a team, paying them extra cash for their work, and allowing them to perform the job while the store was closed. *See* Pl.'s Stmt of Add'l Facts ¶¶ 51, 54.[12] Viewing all evidence and inferences in the EEOC's favor, the court concludes that the EEOC has sufficiently shown that Yapejian was treated less favorably than similarly situated employees.

### B.    Pretext

---

[12] In its response to the EEOC's Local Rule 56.1(b)(3)(B) statement, Circuit City disputes ¶ 51, arguing that it is based on Yapejian's deposition testimony, which Circuit City characterizes as hearsay. However, the EEOC also supports ¶ 51 with a declaration made by Kevin Bellew ("Bellew"), a warehouse worker at the Naperville store. In the declaration, Bellew states that in January 2000, he was paid in cash, along with four other warehouse workers, to strip and wax the Naperville store's floors. *See* Pl.'s Ex. 23 ¶¶ 1-3. Circuit City makes no evidentiary objection to Bellew's declaration. Hence, the court finds that ¶ 51 is based on admissible evidence.

Having found that the EEOC has made out a *prima facie* case for retaliation, the court next considers whether Circuit City has offered a noninvidious reason for Yapejian's discharge. The court need not address this issue at length, for the analysis here largely reproduces that above concerning whether Circuit City's expectations of Yapejian were legitimate. *See Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179-80 (7th Cir. 1997) ("If the employee presents enough evidence that the expectations were not bona fide to stave off summary judgment at [the *prima facie*] stage and thus to place on the employer the burden of producing reasons for the discharge, that evidence may also show that the reasons that the employer has given for firing the plaintiff are phony.").

Circuit City contends that it fired Yapejian for insubordination and for failing to complete assigned tasks. The EEOC argues that Circuit City set Yapejian up for failure by asking him to complete impossible tasks. Having found that the EEOC has produced sufficient evidence to cast doubt on the legitimacy of Circuit City's expectations, the court concludes that the EEOC has carried its burden of producing evidence that Circuit City's reasons for firing Yapejian were pretextual. The court therefore concludes that the EEOC has successfully withstood Circuit City's motion for summary judgment under the indirect method.

## IV.  Punitive Damages

In addition to its motion for summary judgment, Circuit City asks the court to strike a number of the EEOC's damages requests. First, Circuit City asks the court to strike the EEOC's request for punitive damages and for pain and suffering damages under the ADEA. Circuit City correctly notes that these forms of recovery are not available under the ADEA. *See, e.g.*, *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 773 (7th Cir. 2002); *Oranika v. City of Chicago*, No. 04 C 8113, 2005 WL 2663562, at *5 (N.D. Ill. Oct. 17, 2005). In a footnote, the EEOC cites *Glick v. Koenig*,

766 F.2d 265, 270 (7th Cir. 1985), for the proposition that punitive damages are available in ADEA retaliation claims. *Glick* involved neither the ADEA nor punitive damages and appears entirely irrelevant to this case. Circuit City's request to strike the request for punitive damages and damages for pain and suffering is stricken insofar as it pertains to the ADEA.[13]

Circuit City next argues that the EEOC's request for punitive damages under Title VII also should be stricken. The standard for awarding punitive damages under Title VII cases is set forth in the statute, 42 U.S.C. § 1981a(b)(1), and the Supreme Court's decision in *Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999). *Cooke v. Stefani Management Services, Inc.*, 250 F.3d 564, 568 (7th Cir. 2001). Section 1981a(b)(1) provides that a party may recover punitive damages when a plaintiff demonstrates that the defendant engaged in intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). In *Kolstad v. American Dental Association*, 527 U.S. 526 (1999), the Supreme Court outlined a three-part framework for determining whether an award of punitive damages is appropriate under the statutory standard. First, a plaintiff must show that the employer acted with the necessary mental state, viz., with knowledge that its actions may have violated federal law. *See, e.g.*, *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857 (7th Cir. 2001). Second, the plaintiff must show that the employees who discriminated against him were managerial agents acting within the scope of their employment. *Id*. at 858. Finally, if the plaintiff shows the first two elements, the

---

[13] Circuit City also asks the court to strike the EEOC's request for liquidated damages under the ADEA. Circuit City argues that liquidated damages under the ADEA are "similar" to punitive damages under Title VII and that since punitive damages are inappropriate under Title VII, liquidated damages under the ADEA also are inappropriate. Because (as discussed more fully below) the court declines to rule that punitive damages are inappropriate under Title VII, the court likewise declines to rule that liquidated damages are precluded under the ADEA.

employer may avoid liability for punitive damages if it can establish that it undertook good faith efforts to implement an antidiscrimination policy. *Id.*

Circuit City does not discuss the first two requirements. Instead, it argues only that it had made extensive good faith efforts to prevent retaliation. Among other things, Circuit City claims that it takes a "three-prong" approach to preventing discrimination and retaliation, including the promulgation of written policies, employee training, and a practice that it calls "partnering."

Contrary to Circuit City's assertions, however, the evidence of its efforts to prevent retaliation is not unrebutted. Indeed, the EEOC has cited evidence – which Circuit City does not dispute – showing that Circuit City had no policy prohibiting retaliation until July of 1999. While Circuit City may be correct in asserting that the policy was in effect at the time Yapejian was discharged, a reasonable jury could find that the company's efforts were too little, too late. Circuit City also asserts that "many of the managers involved in the decision-making process with respect to Mr. Yapejian testified that they received training and knew that retaliation was prohibited." Reply, at 12-13. This leaves open the question whether *all* relevant managers received such training. Moreover, the EEOC's evidence is undisputed that Circuit City's resource manager and district manager had no recollection of any training with respect to retaliation.

In short, the court finds a triable issue of material fact as to whether Circuit City had undertaken good faith efforts to prevent retaliation. Consequently, Circuit City's request to strike the EEOC's prayer for punitive damages under Title VII is denied.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment is denied. The request to strike the EEOC's damages requests is granted in part and denied in part.

ENTER:


/s/_____
JOAN B. GOTTSCHALL
United States District Judge


Dated: May 11, 2006